UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DOUGLAS G. HARMON,<br><br>    Plaintiff,<br><br>      v.<br><br>THE UNITED STATES OF AMERICA,<br>acting by and through BUREAU OF<br>INDIAN AFFAIRS,<br><br>    Defendant. | Case No. 4:15-cv-00173-BLW<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## INTRODUCTION

Pending before the Court is Defendant United States of America's Motion for

Summary Judgment (Dkt. 13) and Plaintiff's Motion for Spoliation Sanctions (Dkt. 24).

The Court heard oral argument on February 3, 2017 and took the motions under

advisement. For the reasons expressed below, the Court will grant in part and deny in part

both motions.

## BACKGROUND

Plaintiff Doug Harmon filed this action against the United States of America and

the Bureau of Indian Affairs ("BIA") in connection with BIA's operation of the Fort Hall

Irrigation Project ("FHIP"). Harmon alleges that BIA failed to properly maintain and

administer the water delivery systems on the FHIP, resulting in multiple flooding events

in 2012 that damaged crops on a 115-acre parcel where he farmed potatoes.

The FHIP provides irrigation water to the Fort Hall Indian Reservation through the use of storage reservoirs, diversion dams, canals, and ditches. *Def. SOF* ¶ 2, Dkt. 13-1. FHIP ditches are divided into at least three categories: "lateral ditches" owned by BIA; "service ditches" owned by BIA; and "farm ditches" owned by individuals. Def. SOF ¶ 3. The structures at issue here include:

- The "Main Canal," a primary lateral which carries water to various delivery points, including the Park Lateral.
- The "Park Lateral," a canal that provides water to several properties and farm ditches adjacent to the Harmon property.
- The "Yupe Ditch," a farm ditch which extends off the Park Lateral along the southern border of the Harmon farm and supplies water to the Yupe and Lutz farms.
- The "Jackson/Devinney Ditch," a farm ditch which extends off the Park Lateral to the southeast of the Harmon farm and supplies water to the Jackson and Devinney farms.

*Pl. SOF* at 2–3, *Def. SOF* ¶ 3.

Day-to-day operations and maintenance of the FHIP is performed by BIA staff, including Irrigation System Operators ("Ditchriders") and Maintenance Workers, in accordance with BIA regulations and an internal project manual ("O&M Manual"). *Pl. SOF* at 7, Dkt. 16-1. Ditchriders unlock canal headgates when users are scheduled to receive their water, control the water levels in canals, clean trash racks serving the park lateral, log complaints from water users, and canvas the irrigation system for damages. *Pl. SOF* at 11; *Def. SOF* ¶ 8. Ditchriders can place locks on headgates to prevent them from being opened, or place collars on headgates to limit water flow. *Pl. SOF* at 10. Maintenance workers perform necessary maintenance on the irrigation structures,

including weed-spraying and ditch-burning. *FHIP O&M Guidelines pt. 1*, Dkt. 13-5, at

51. BIA possesses rights-of-ways which allow the agency to gain access to project

infrastructure for maintenance purposes. Idaho Code Ann. § 42-1204.

Harmon alleges that his property was flooded on at least five separate occasions in

2012 due to the negligence of BIA: on July 4, August 6, August 20, September 25, and

September 26. *Pl. SOF* at 12–13; *Def. SOF* ¶ 14. On each occasion, Harmon contacted

BIA personnel, who responded to the complaints and attempted to identify the source of

the flooding. *Pl. SOF* at 13; *Def. SOF* at ¶¶ 12–13. The Harmons had also complained to

BIA personnel about flooding on their property prior to 2012. *Pl. SOF* at 11; *McKean*

*Dep.* 40:12–40:22, Dkt. 16-17.

The flooding events that occurred on July 4, 2012 and August 6, 2012 came from

the Ellsworth property located on the east side of the Harmon property. *D. Harmon Dep.*

36:24–38:14, Dkt. 16-3; *G. Harmon Dep.* 18:20–21:5, Dkt. 16-4; *Pl. Mot. Summ. J.* Ex. 6

at 8, Dkt. 13-8. Gary Ellsworth had taken over the farm when his father passed away and

experienced problems learning how to properly flood irrigate the fields. *Def. SOF* ¶ 16.

Due to the nature and slope of his land, water from the Ellsworth property would enter

Plaintiff's fields when Ellsworth failed to properly monitor his irrigation. *Def. SOF* ¶ 16.

The flooding that occurred on August 20 and September 26 was caused by a headgate

that had been opened too wide, allowing excess water to wash out part of the

Jackson/Devinney ditch and run into Plaintiff's field. *Def. SOF* at 14; *Pl. SOF* ¶¶ 18, 19.

Finally, the September 25 flooding was caused by a gopher hole in the Yupe ditch. *Def.*

*SOF* at 15. The Yupe ditch was filled with grass and in generally poor condition at that time, but BIA performed maintenance work on the ditch after the September 25 flooding incident. *Pl. SOF* at 13.

On or about June 30, 2014, Plaintiff filed an administrative tort claim for damages, as required by 28 USC § 2675, alleging that these flooding incidents were a direct and proximate cause of BIA's negligent failure to properly monitor water flow, lock and collar headgates, and keep surface ditches maintained. The government denied the claim on December 5, 2014, and Harmon filed his complaint in the instant action on May 21, 2015.

## ANALYSIS

**1.    Motion for Spoliation Sanctions**

### A.    *Legal Standard*

Spoliation is defined as the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation" once the duty to do so has been triggered. *Kearney v. Foldy & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (internal quotation and citation omitted). A party seeking sanctions for spoliation bears the burden of establishing that the opposing party (1) destroyed relevant evidence and (2) had an obligation to preserve the evidence when it was destroyed or altered. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015). An obligation to preserve attaches when a party knows or should reasonably know that the evidence is potentially relevant to litigation. *See United States v. Kitsap*

*Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002). Once such a showing is made, the district court has inherent discretionary authority to levy sanctions. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

Spoliation sanctions may include dismissal of claims, exclusion of evidence, or an instruction that the jury may or must presume that the destroyed evidence, if produced, would have been adverse to the party who destroyed it. *See Unigard Sec. Ins. Co. v. Lakewood*, 982 F.2d 363, 369 (9th Cir. 1992). When considering the appropriate sanction, courts consider the: "(1) willfulness or bad faith of the party responsible for loss of evidence; (2) degree of prejudice sustained by opposing party; and (3) what is required to cure prejudice." *Miller v. Four Winds Int'l Corp.*, 827 F. Supp. 2d 1175, 1181 (D. Idaho 2011).

**B.    *Existence of Spoliation***

Harmon seeks spoliation sanctions for the government's inability to produce certain maintenance logs and other records maintained by BIA related to this matter. These records include: (i) MAXIMO records; and (ii) daily logbooks of Maintenance Supervisor Steven Guardipee, Watermaster Clifford Buckskin, Ditchrider Jesse Rodriguez, and Ditchrider Nick Broncho. The Court begins by addressing whether Harmon has sufficiently demonstrated spoliation of these records, then moves to a determination of the appropriate sanction.

**(i)    MAXIMO Records**

Plaintiff argues that the government's failure to produce MAXIMO records of

BIA's maintenance work on ditches adjacent to the Harmon parcel constitutes spoliation. MAXIMO is a commercial software used to track maintenance operations for all DOI agencies, including "scheduling, preventive maintenance, work orders, labor and expense tracking, procurement and reporting." *FHIP O&M Guidelines pt. 1,* at 16, Dkt. 13-5. "[U]se of MAXIMO is mandated for all agencies by [Department of Interior] policy." *Id.* at 16. Accordingly, the FHIP's O&M Guidelines require entry of maintenance problems and repairs into the MAXIMO system. *FHIP O&M Guidelines pt. 2,* at 4–7, Dkt. 13-6. The FHIP Maintenance Supervisor, Steven Guardipee, has primary responsibility for ensuring that work orders are entered into MAXIMO. *FHIP O&M Guidelines pt. 1* at 48, 55. Each year, FHIP personnel are also required to compile an annual MAXIMO maintenance report with "1) descriptions of maintenance activities; and 2) cost estimates for each item, broken down by personnel, personnel costs, equipment and supplies." *FHIP O&M Guidelines pt. 2,* at 6.

BIA employees acknowledged that they performed maintenance work on the Yupe ditch before and after the flooding events in 2012. *See, e.g.*, *Bollinger Dep.* 17:4–16, 25:8–25:14, 30:18–30:19, 223:2–223:3, Dkt. 16-11; *Buckskin Dep.* 108:23–109:3, Dkt. 16-15. However, the government was unable to find any MAXIMO records of such work. Steven Guardipee acknowledged that such FHIP maintenance projects should have been entered into MAXIMO but could not recall whether the MAXIMO records were ever created. *Guardipee Dep.* at 43:22–44:5; 49:14–50:6, Dkt. 16-20. He explained that "sometimes stuff got overlooked." *Id.* at 43:1–44:5, 49:5–9. On this basis, the Court

concludes that BIA simply neglected to document certain FHIP maintenance and repair work in MAXIMO. While there is no evidence that the sough-after evidence was lost or destroyed, this failure to create MAXIMO entries nonetheless violated BIA's clear duty under agency policy.

The government argues that even if BIA was obligated to create these MAXIMO records, the spoliation doctrine does not apply to evidence that never existed. The failure to create evidence, without more, would not ordinarily warrant a spoliation sanction. *See, e.g.*, *Lamon v. Adams*, No. 1:09-cv-00205, 2015 WL 1879606, at *3 (E.D. Cal. Apr. 22, 2015) ("Nor can a Court issue sanctions based on a party's failure to create evidence"). However, the prophylactic and punitive justifications underlying the spoliation doctrine may justify sanctions where a party fails to create evidence in violation of a statutory, regulatory, or internal policy obligation. *See, e.g.*, *Ramirez v. Pride Dev. & Const.*, 244 F.R.D. 162, 164 (E.D.N.Y. 2007) (imposing an adverse inference instruction as a penalty for the defendant's failure to create records pursuant to New York Labor Law); *Smith v. United States*, 128 F. Supp. 2d 1227, 1233 (E.D. Ark. 2000) (imposing an adverse inference instruction as a penalty for physician's failure to dictate post-surgical notes, in violation of hospital procedure).

The question remains, however, whether the violation of a records-retention law may constitute a breach of duty sufficient to impose a spoliation sanction. Several circuit courts of appeals have answered this question in the affirmative, where: (1) the movant was a member of a class that the records-retention law sought to protect and (2) imposing

a sanction would further the law's purpose. *See, e.g.*, *Talavera v. Shah*, 638 F.3d 303, 311 (D.C. Cir. 2011) (violation of OPM and EEOC document-retention regulations pertaining to Title VII complains warranted a spoliation sanction); *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 108–09 (2d Cir. 2001) ("[W]here, as here, a party has violated an EEOC record-retention regulation, a violation of that regulation can amount to a breach of duty necessary to justify a spoliation inference in an employment discrimination action."); *Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 716 (7th Cir. 1998) ("The violation of a record[-]retention regulation creates a presumption that the missing record contained evidence adverse to the violator."); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994) (plaintiff "was entitled to the benefit of a presumption that the destroyed documents would have bolstered her case" where employer violated record retention regulation); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987) (plaintiff was entitled to a presumption that documents destroyed in violation of Title VII recordkeeping requirements would have bolstered her case); *Matteo v. Kohl's Dep't Stores, Inc.*, 533 F. App'x 1, 3 (2d Cir. 2013) (upholding district court's imposition of sanctions for Department Store's failure to preserve video footage in violation of internal policies). *But see Lamon v. Adams*, No. 1:09-CV-00205-LJO, 2015 WL 1879606, at *2 (E.D. Cal. Apr. 22, 2015) (violation of a state prison record-retention regulation did not provide a basis for a court's imposition of spoliation sanctions).

The piecemeal enactment and amendment of the Federal Records Act make it difficult to identify its overarching "purpose." The Federal Records Act is a compilation

of statutes that collectively set forth federal agencies' records creation, management, and disposal duties. *See* 44 U.S.C. §§ 2101 et seq., 2901 *et seq.*, 3101 *et seq.*, 3301 *et seq.*[1] These provisions require the head of each federal agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101. In addition, the Archivist of the United States is to "provide guidance and assistance to Federal agencies . . . to ensur[e] adequate and proper documentation of the policies and transactions of the Federal Government and ensur[e] proper records disposition." 44 U.S.C. § 2904(a).

The Supreme Court, in *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 149 (1980), concluded that the legislative history of the Act "reveals that [its] purpose was not to benefit private parties, but solely to benefit the agencies themselves and the Federal Government as a whole." The Court cited the Senate Report for the 1950 Federal Records Act, which stated that "records come into existence, or should do so, not . . . to satisfy the archival needs of this and future generations, but first of all to serve the administrative and executive purposes of the organization that creates them." *Id.* (citing S. Rep. No. 2140, 81st Cong., 2d Sess., 4 (1950). However, as the D.C.

---

[1] The "Federal Records Act" is composed of the Records Disposal Act of 1943, Records Disposal Act, Pub. L. No. 78-115, 57 Stat. 380 (1943) (codified as amended at 44 U.S.C. §§3301−3314 (2006)), the Federal Records Act of 1950, Federal Records Act, Pub. L. No. 81-754, § 6, 64 Stat. 578 (1950) (codified as amended at chapters 21, 25, 27, 29 and 31 of Title 44), and the Federal Records Management Amendments of 1976, Pub. L. No. 94-575, 90 Stat. 2724 (1976) (codified as amended at 44 U.S.C. §§2901−2907 (2006)).

Circuit later noted, the *Kissinger* Court conducted only a limited legislative history review to determine whether the particular plaintiffs at issue there could assert a private right of action under those government records laws. *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 53 (D.C. Cir. 1983). "Since *Kissinger* made its findings about congressional intent in a different context and with a different standard, it would be inappropriate to have them control here absent additional supporting analysis." *Id.*

After a lengthy review of the text and legislative history of the Federal Records Act, the D.C. Circuit in *American Friends* concluded "Congress intended, expected, and positively desired . . . private parties whose rights may have been affected by government actions to have access to the documentary history of the federal government." 720 F.2d at 57. The court observed that the plain text of the Federal Records Act demonstrates a balance among several broader, competing goals, including administrative efficiency and the substantive need for federal records by public officials, scholars, historians, and private individuals. For example, same purposes section of the FRA that speaks of "efficient and effective records management" mentions "[a]ccurate and complete documentation of the policies and transactions of the Federal Government." 44 U.S.C. § 2902. Agency heads are directed to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information *necessary to protect the legal and financial rights* of the Government and of *persons directly affected by the agency's activities*." 44 U.S.C. § 3101 (emphasis added). *Accord*

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1285, 1287 (D.C. Cir. 1993) (observing "Congress' evident concern with preserving a complete record of government activity for historical and other uses").

This Court agrees that the plain text and legislative history of the Federal Records Act reveal a concern for the public's interest in preservation of government records. Moreover, Harmon's interests are directly covered by the language of the Act, which seeks to protect those "directly affected by an agency's activities" and whose "legal and financial rights" may be affected by the government's failure to preserve a documentary history of its undertakings. 44 U.S.C. § 3101.

Next, the Court must determine whether imposing an evidentiary sanction here would further the law's purpose or instead disrupt the Federal Records Act's careful balance between public rights and agency obligations. Only two cases appear to have addressed the question of whether a Federal Records Act violation may support a spoliation claim. *See True the Vote, Inc. v. Internal Revenue Serv.*, No. CV 13-734, 2014 WL 4347197, at *5 (D.D.C. Aug. 7, 2014); *Gerlich v. U.S. Dep't of Justice*, 828 F. Supp. 2d 284, 300–01 (D.D.C. 2011), *aff'd in part, rev'd in part*, 711 F.3d 161 (D.C. Cir. 2013). In the first, *Gelrich*, the plaintiff sought spoliation sanctions for the government's destruction of records in violation of the FRA. 828 F. Supp. 2d at 284. The U.S. District Court for the District of Columbia declined to apply a spoliation inference because the records were disposed in conformance with agency policy. *Id.* However, the Court reasoned that "[i]f a Department employee had destroyed agency materials in violation of

a records disposition schedule, that destruction would likely warrant a spoliation inference." *Id.*

Just three years later, the D.C. District Court appeared to reverse course. In *True the Vote*, the plaintiff complained of the IRS's failure to preserve documents lost during a hard drive crash. 2014 WL 4347197, at *5. The court declined to apply a spoliation sanction, reasoning that the Federal Records Act does not vest federal courts with jurisdiction to entertain claims that a government agency has violated agency records management policies and procedures. *Id.* (citing *Kissinger*, 445 U.S. at 147–148). "Without the authority to make that determination in the first instance, it would be inappropriate for the Court to predicate a finding of spoliation on a violation of the Federal Records Act." *Id.*

A spoliation sanction is a far cry from a direct suit to enforce FRA violations, however. The plaintiff here does not seek to enjoin federal recordkeeping activity or impose liability on a federal agency. Nor is this Court being asked to second-guess BIA's records-management guidelines, scrutinize agency policy judgments, or weigh managerial and efficiency concerns. Harmon asks the Court only to lessen the prejudice resulting from BIA's haphazard record maintenance, actions which violated clearly-established agency policy. To ask plaintiff alone to shoulder the consequences of such a violation would "place a premium on [the government's] failure to keep proper records in conformity with [its] statutory duty." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). It is therefore within the inherent authority of this court, *Chambers v.*

*NASCO, Inc.*, 501 U.S. 32, 43 (1991), and consistent with the goals of the FRA, to fashion an appropriate sanction.

    **(ii)**    **Daily Logbooks**

Harmon also complains of the government's failure to produce the 2012 daily logbooks of Maintenance Supervisor Steven Guardipee, Watermaster Clifford Buckskin, and Ditchriders Jesse Rodriguez and Nick Broncho. The logbooks of Buckskin and Guardipee were eventually found and therefore not subject to the spoliation doctrine. *Beck Decl.* Ex. A, Dkt. 19-4; *Beck Decl.* Ex. C, at 6, Dkt. 19-6. However, the government's inability to produce the logbooks of Ditchriders Rodriguez and Broncho may constitute spoliation.

The FHIP O&M Guidelines require ditchriders to use daily logbooks to record maintenance issues, headgate openings or changes, complaints from water users, emergencies, and other pertinent events. Furthermore, the manual states that "[d]iaries from the previous year shall be filed in the Irrigation Project Office." *FHIP O&M Guidelines pt. 2,* at 5.  Both Rodriguez and Broncho acknowledged that they had kept logbooks in 2012, in accordance with BIA policy. However, both appear to have been lost since that time.

Jesse Rodriguez testified that he referenced his logbook in July 2013 when preparing a report in response to Harmon's tort claim notice. *Rodriguez Dep.* 32:20–33:21, Dkt. 19-10. When Plaintiff sought discovery of the logbook, however, Rodriguez was unable to find it. *Id.* 34:13–21. The logbook appears to have been lost after BIA's

duty to preserve relevant evidence arose. A formal litigation hold was not issued in this case until June 2015, when BIA was served with the summons and complaint in this action. However, BIA was on notice of Harmon's intent to pursue litigation in 2013 when it was served with his tort claim notice. *Bollinger Dep.* 148:15–149:14. BIA was also undoubtedly aware that ditchrider logbooks were potentially relevant to such litigation, as evidenced by the fact that Rodriguez referred to his logbook to prepare a response statement to the tort claim notice. Accordingly, Harmon has established the elements of spoliation as to the Rodriguez logbook.

There is little evidence regarding the date and circumstances under which Broncho's logbook was lost or destroyed. Nick Broncho testified that that he kept a logbook in 2012 and turned it over to Brandon McKean at the end of the season. *Broncho Dep.* 29:10–15, 158:19–23, Dkt. 16-8.  Neither Broncho nor his supervisors could provide any information about the last date on which the logbook was seen, or whether the logbook was lost after the agency was on notice of Harmon's intent to pursue litigation. Nonetheless, BIA employees were required by agency regulation to keep and file Broncho's 2012 logbook in the Irrigation Project Office, regardless of whether the logbook was potentially relevant to litigation. For the reasons outlined in Section 1(B)(i) above, the violation of this duty to preserve is sufficient to constitute spoliation.

## C.   *Appropriate Sanction*

Having found that BIA engaged in spoliation of the MAXIMO records and Rodriguez and Broncho logbooks, the Court must determine the appropriate sanction by

considering: "(1) willfulness or bad faith of the party responsible for loss of evidence; (2) degree of prejudice sustained by opposing party; and (3) what is required to cure prejudice." *Miller v. Four Winds Int'l Corp.*, 827 F. Supp. 2d 1175, 1181 (D. Idaho 2011).

The Court finds no evidence that the government engaged in intentional or bad faith spoliation. However, BIA's recordkeeping efforts were rather slipshod, despite knowledge of the obligations to create and maintain MAXIMO records and ditchrider logs. The spoliation here was at least negligent.

Furthermore, BIA's failure to maintain adequate records has prejudiced Plaintiff's ability to prove his case. There is no way to determine what the spoliated evidence would have revealed. However, it is likely that the MAXIMO records and logbooks would have been relevant to a contested issue here—namely, whether BIA assumed a duty to regulate water use and shut off flows to poorly-maintained or managed ditches. These documents would likely have contained records of other flooding incidents, of the installation of locks and collars, and of complaints alerting BIA to problems on the ditches at issue. Furthermore, other available evidence is not an adequate substitute for such lost records. The available logbooks provide an incomplete record of relevant events. Furthermore, FHIP personnel have been unable recall with any certainty what work was performed in 2012 or the years preceding the flooding incidents at issue here.

Under the circumstances, the Court concludes that the most appropriate remedy is a *permissive* adverse inference instruction—that the jury may infer that the missing

evidence would have been favorable to Harmon's case. This type of sanction is considered to be among the least severe, as the jury is always at liberty to draw such inferences from circumstantial evidence. *See Mali v. Fed. Ins. Co.*, 720 F.3d 387, 393 (2d Cir. 2013) (finding that a permissive inference instruction is not a sanction but "simply an explanation to the jury of its fact-finding powers."). The Court therefore grants plaintiff's motion, insofar as it seeks a permissive instruction, but reserves judgment on the appropriate wording of such an instruction until trial.

Plaintiff also asks the Court to make a series of detailed inferences about the contents of the lost evidence for purposes of summary judgment. The Court need not address the reasonableness of such inferences, as they would not alter the Court's determination on the government's Motion for Summary Judgment. As explained in detail below, Harmon failed to establish any reliance on BIA's alleged "assumption of duty" to maintain private ditches. No inference about the scope of BIA's maintenance work would change that conclusion. The existing evidence before the court is sufficient, without any inferences, to deny the motion in all other respects. Furthermore, in ruling on a motion for summary judgment, the Court must already accept as true plaintiff's plausible account of the facts and draw "all justifiable inferences" in the non-movant's favor. *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1140 (9th Cir. 2003). However, to the extent that Harmon seeks a jury instruction at trial encompassing this detailed list of inferences, the motion is denied.

2.     **Motion for Summary Judgment**

A.     *Legal Standard for Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).  There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a

genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the non-moving party to explain how the facts are in controversy creating "a genuine issue for trial." *British Motor Car Distrib. Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371, 374 (9th Cir. 1989).

The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex,* 477 U.S. at 324. However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).   Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts."  *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**B.**    ***Analysis***

Plaintiff seeks recovery on a theory of negligence, pursuant to the Federal Tort Claims Act ("FTCA"). The FTCA waives the United States' immunity and provides governmental liability for tort claims "in the same manner and to the same extent as a private individual under like circumstances . . . ." *Nurse v. United States*, 226 F.3d 996,

1000 (9th Cir. 2000) (quoting 28 U.S.C. § 2674). Whether an actionable tort exists is examined "under the law of the state where the act or omission occurred." *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).

Under Idaho law, a cause of action for common-law negligence has four elements: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage." *Nation v. State, Dept. of Corr.*, 158 P.3d 953, 965 (Idaho 2007) (internal citation omitted). Here, the essence of Plaintiff's negligence claim is (1) that BIA had a duty to regulate water flow and maintain private ditches on the FHIP, (2) that Defendant breached its duty by failing to lock and collar headgates and keep surface ditches maintained, and (3) that this breach was both an actual and proximate cause of (4) damage to Plaintiff's crops.

The government argues that summary judgment is appropriate here because BIA did not owe Harmon a duty to regulate water use or maintain private ditches, and even if it did, Plaintiff's injuries were caused by the acts and omissions of third parties.

### (i)    Duty

Plaintiff argues that BIA had a duty to "implement procedures and protocol to . . . regulate . . . water on the FHIP" and to "properly maintain the water delivery system" adjacent to the Harmon plot, under the following theories: (1) negligence per se, based on a violation of BIA regulations; (2) a voluntary assumption of duty. The Court addresses each theory in turn.

(a)     *Negligence Per Se*

"[I]n Idaho, it is well established that statutes and administrative regulations may define the applicable standard of care owed, and that violations of such statutes and regulations may constitute negligence per se." *Sanchez v. Galey*, 733 P.2d 1234, 1242 (1986). "In order to replace a common law duty of care with a duty of care from a statute or regulation, the following elements must be met: (1) the statute or regulation must clearly define the required standard of conduct; (2) the statute or regulation must have been intended to prevent the type of harm the defendant's act or omission caused; (3) the plaintiff must be a member of the class of persons the statute or regulation was designed to protect; and (4) the violation must have been the proximate cause of the injury." *O'Guin v. Bingham County*, 122 P.3d 308, 311 (2005).

Harmon asserts that BIA had a duty to follow its own regulations governing the Fort Hall Irrigation Project, the violation of which supports it claim of negligence. Specifically, Harmon points to 25 C.F.R. sections 171.110, 171.300, 171.400, and 171.130, which provide answers to questions such as "How does the BIA administer its irrigation facilities?" and "Does BIA restrict my water use?"

This theory of duty fails for two reasons. First, the provisions cited by Harmon are permissive in tone, and do not appear to impose any mandatory obligations on the BIA. *See, e.g.*, 25 C.F.R. § 171.110 ("Such enforcement *can* include refusal or termination of irrigation services to you."); 25 C.F.R. § 171 .300 ("We *may* withhold services if you use water for any other purpose."); 25 C.F.R. § 171.400 (BIA "*may* build[,]" "*may* charge[,]"

"*may* require maintenance[,]" and "*may* remove it or perform the necessary maintenance") (emphasis added).

Second, even assuming these provisions compelled BIA to undertake certain activities, the violation of a federal regulation will not, by itself, support a tort claim under the FTCA. *Love v. United States*, 60 F.3d 642, 644 (9th Cir. 1995). The United States is liable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674 (1976). Thus, Harmon must show that BIA's actions, if committed by a private party, would constitute a tort in Idaho. *Love*, 60 F.3d at 644. Harmon has not done so. To the extent that the cited regulations impose any duty on BIA, that duty does not extend to private individuals in like circumstances. Nor does Idaho law impose any comparable oversight and management obligations on private individuals.[2] Thus, BIA's alleged failure to adhere to the above-cited federal regulations will not, by itself, support an FTCA claim.

_____

[2] The only applicable tort duty imposed on irrigation ditch owners is found in Idaho Code § 42-1204, which provides that "[t]he owners or constructors of ditches, canals, works or other aqueducts . . . whether the said ditches, canals, works or aqueducts be upon the lands owned or claimed by them, or upon other lands, must carefully keep and maintain the same . . . in good repair and condition, so as not to damage or in any way injure the property or premises of others. . . ."

Under this provision, BIA owed a statutory duty to maintain canals for which it may be deemed the "owner or constructor." BIA owns the Main Canal and Park Lateral but does not own the Yupe and Jackson/Devinney farm ditches, which were privately held. While BIA appears to have performed some maintenance work on these private ditches, it's unlikely that BIA falls under the definition of a "constructor." Even assuming it does, the Idaho Supreme Court held that once a constructor has turned over a ditch to its owner, it has no further responsibility under I.C. § 42-1204. *See Gates v. Pickett & Nelson Const. Co.*, 432 P.2d 780, 790 (1967). Accordingly, Harmon does not appear to contend that BIA violated a maintenance duty under Idaho Code § 42-1204.

(Continued)

(b)     *Voluntary Assumption of Duty*

This brings us to Plaintiff's argument that BIA voluntarily assumed a duty to regulate water flow or perform maintenance on private farm ditches. Under the tort doctrine of assumption of duty, or so-called "Good Samaritan rule,"[3] "one [who] voluntarily undertakes to perform an act, having no prior duty to do so, [assumes a] duty . . . to perform the act in a non-negligent manner." *Featherston v. Allstate Ins. Co.*, 875 P.2d 937, 940 (Idaho 1994); (*citing Bowling v. Jack B. Parson Cos.*, 793 P.2d 703, 705 (Idaho 1990)); *see also* Restatement (Second) of Torts §§ 323, 324A.[4] "Although a person can assume a duty to act on a particular occasion, the duty is limited to the discrete episode in which the aid is rendered. . . . [P]ast voluntary acts do not entitle the benefited party to expect assistance on future occasions, at least in the absence of an

---

[3] The Court avoids the term "Good Samaritan" doctrine in this context, since the phrase is more commonly used today to refer to state statutory protections offered to good samaritans who undertake negligent rescue attempts. *See* Black's Law Dictionary 624 (5th ed. 1979).

[4] The voluntary assumption of duty doctrine is enunciated in the Restatement (Second) of Torts § 323 as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Section 324A parallels section 323 but deals with liability to third persons. Idaho has not expressly adopted this approach, but courts cite it approvingly and Idaho common law embodies these principles. *See Fagundes v. State*, 774 P.2d 343, 346 (Ct. App. 1989) (applying the provisions of Section 323); *Carroll v. United Steelworkers of Am.*, 692 P.2d 361, 367 (Idaho 1984) (J. Bistline, dissenting) (same); (*Rawson v. United Steelworkers of America*, 726 P.2d 742 (Idaho 1986), *vacated on other grounds*, 482 U.S. 901, (1987) (applying the provisions of Section 324A). *But see Bowling v. Jack B. Parson Companies*, 793 P.2d 703, 705 (1990) (rejecting the contention that section 324A has the status of law in Idaho); *Baccus v. Ameripride Servs., Inc.*, 179 P.3d 309, 314 (Idaho 2008) (rejecting as untimely an argument the Idaho Supreme Court should adopt section 324A).

**MEMORANDUM DECISION AND ORDER - 22**

express promise that future assistance will be forthcoming." *Udy v. Custer County*, 34 P.3d 1069, 1073 (2001). However, a duty to provide future assistance may arise where: (1) one has previously performed that service; (2) "others are relying on the continued performance of the service"; (3) "and it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking." *Baccus v. Ameripride Servs., Inc.*, 179 P.3d 309, 314 (Idaho 2008).

In accordance with assumption of duty principles, courts have held that the "United States may be liable under the Federal Tort Claims Act for negligent provision of services upon which the public has come to rely." *United Scottish Ins. Co. v. United States*, 614 F.2d 188, 196 (9th Cir. 1979) (quoting *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970). For example, in *Indian Towing Co. v. United States*, 350 U.S. 61, 126–27 (1955), the Supreme Court applied the assumption of duty doctrine in holding that the Coast Guard was liable under the FTCA for failing to use due care in maintaining a lighthouse on which sailors had come to rely.

While tort liability cannot be predicated upon a violation of federal law alone, as noted above, the existence of federal regulations or statutes may provide evidence that the government assumed a duty and may strengthen claims of justifiable reliance. *See, e.g.*, *Sheridan v. United States*, 487 U.S. 392 (1988) (naval base firearm regulations); *Olson v. United States*, 306 F. App'x 360, 363 (9th Cir. 2008) (Federal Coal Mine Safety and Health Act regulations); *Loge v. United States*, 662 F.2d 1268 (8th Cir. 1981) (FDA vaccine testing, licensing regulations); *United Scottish Ins. Co. v. United States*, 614 F.2d

188, 194 (9th Cir. 1979), *rev'd on other grounds United States v. Varig Airlines*, 467 U.S. 797 (1984) (FAA inspection regulations).

Here, construing the facts and making all reasonable inferences in favor of Harmon, the Court concludes that there is a genuine issue of material fact as to whether BIA undertook a voluntary duty, on which the Harmons relied, to regulate water use on the FHIP. The agency's regulations and public communications to nearby farmers and water users indicated that the agency would shut off water flows to poorly-maintained ditches and abusive users. For example, a February 15, 2012 letter from BIA to project water users advised that "[w]ater delivery may be reduced or refused to such ditches not satisfactorily maintained." *Beck. Decl.* Ex. P, at 2, Dkt. 16-18. BIA regulations suggest the same. 25 C.F.R. § 171.130; 25 C.F.R. 171.220 ("You must . . . (c) [p]roperly operate, maintain, and rehabilitate your farm ditch" to receive irrigation service). David Bollinger, head of the FHIP, indicated that BIA used this authority to regulate water flow when alerted to problems with private ditches. BIA would install collars, to restrict how high a headgate could open, or install locks, to prevent a user from opening a headgate altogether. *Bollinger Dep.* 103:16–105:9. Brandon McKean, the ditchrider supervisor, testified as to the same. *McKean Dep.* 40:23–41:1. Nick Broncho, a ditchrider, confirmed that when alerted to a problem with a private ditch, he would not permit the user to get water until the problem was addressed. *Broncho Dep.* 27:18–28:10, 33:12–36:20, 129:4–130:4.

The evidence also suggests that BIA induced reliance on their efforts to regulate

water use. Douglas Harmon stated that, on various instances, BIA employees agreed to place locks and collars on certain headgates thought to be the cause of flooding on his property. *D. Harmon Dep.* 26:25–30:21. Gordon Hamon also testified that he asked BIA employees to locks headgates to better regulate water use, noting that BIA employees promised to "take care" of the problem. *G. Harmon Dep.* 20:20–21:20, 51:21–54:11.

Finally, BIA, through its employees, was aware that certain water users had caused flooding issues, whether because of user errors or maintenance issues. *See, e.g.*, *McKean Dep.* 34:17–35:12, 135:5–19. It was therefore reasonably foreseeable that BIA's failure to perform its voluntary undertaking—here, shutting off or regulating water use to problematic ditches—would result in flooding damage to neighboring farms, a legally-recognized harm.

In contrast, the evidence is insufficient to support a finding that BIA assumed a duty to maintain private farm ditches. It appears that BIA previously performed both preventative and emergency maintenance on the private ditches at issue. For example, while controverted, Mr. Yupe testified that BIA was responsible for maintaining the private ditch running along his property and had performed maintenance work every spring, such as burning off weeds and re-ditching. *Yupe Dep.* 14:21–16:17, 23:11–24:8, 30:3–31:14. David Bollinger also testified that BIA performed an emergency repair upon the Yupe ditch after the September 25 flooding incident. *Bollinger Dep.* 215:15–217:6.

However, Harmon presents no evidence that he relied on BIA to maintain private ditches in good repair. While the Harmons were aware that BIA occasionally repaired the

Yupe ditch, knowledge alone is insufficient to give rise to reliance. Harmon appeared to understand that BIA was not responsible for maintaining private ditches, and sought only to have BIA to shut off water to poorly maintained ditches. *D. Harmon Dep.* 105:9–105:11 ("They did a . . . poor job of policing. That is what their job is."). Without any reliance, BIA owed no duty to the Harmons to perform maintenance on the private ditches. *See Baccus v. Ameripride Servs., Inc.*, 179 P.3d 309, 314 (Idaho 2008).

#### (ii)    Causation

The government argues that even if BIA assumed a duty of care, Plaintiff's injuries were proximately caused by the acts and omissions of third parties, not those of BIA. Five separate flooding events—occurring on July 4, August 6, August 20, September 25, and September 26, 2012—are at issue in this case. The Court addresses each in turn.

The flooding that occurred on July 4, 2012 and August 6, 2012 came from the Ellsworth property located to the east of the Harmon property. *D. Harmon Dep.* 36:24–38:14; *G. Harmon Dep.* 18:20–21:5; *Pl. Mot. Summ. J.* Ex. 6 at 8, Dkt. 13-8. It appears that water from the Ellsworth property entered Plaintiff's fields when Ellsworth failed to properly monitor his flood irrigation. *Pl. SOMF* ¶ 16. Cliff Buckskin agreed that this "was a common problem" he was aware of before 2012. *Buckskin Dep.* 28:12–14. Buckskin also indicated that BIA employees had previously placed locks and collars to prevent the Ellsworths from taking more water than they could handle. *Buckskin Dep.* 34:11–35:18; 54:5–56:2. There is a dispute as to whether the locks and collars were in

place in July and August, 2012. Thus, a reasonable jury could find that, but for BIA's negligent failure to install a lock or collar on the Park Lateral headgate or otherwise restrict Ellsworth's water use, Plaintiff's land would not have been flooded.

The flooding that occurred on August 20 and September 26 was caused by a headgate that had been opened too wide, allowing excess water to wash out part of a private farm ditch and run over Plaintiff's field. *Def. SOF* at 14; *Pl. SOF* ¶¶ 18, 19. A reasonable jury could find that, but for BIA's negligent failure to install a collar on the Park Lateral headgate, Plaintiff's land would not have been flooded.

Finally, the September 25 flooding was caused by a gopher hole in the Yupe private farm ditch. There is no evidence that BIA was aware of the gopher hole before the flooding incident, such that it might have had a duty to shut of water to the ditch. Accordingly, Harmon has failed to demonstrate a material dispute of fact as to whether BIA's acts or omissions were an actual or proximate cause of this final flooding incident.

In sum, the Court concludes that Plaintiff has established sufficient facts to show that BIA was both a proximate and actual cause of 4 of the 5 discrete flooding events. However, the Court will grant summary judgment as to the flooding incident on September 25.

## CONCLUSION

For the reasons set forth above, the Court will grant Plaintiff's Motion for Spoliation Sanctions insofar as it seeks a permissive adverse-inference jury instruction about the contents of the missing evidence. Questions of fact largely preclude summary

judgment on Plaintiff's claims. However, the Court will grant the Government's Motion for Summary Judgment insofar as Plaintiff bases his negligence claim on (1) a duty of care imposed by BIA regulation or (2) a voluntary assumption of duty to maintain private farm ditches. Furthermore, the Court will grant the Government's Motion for Summary Judgment as to the September 25, 2012 flooding incident. Genuine issues of material fact preclude summary judgment on the four remaining flooding incidents.

## ORDER

**IT IS ORDERED:**

1.     Plaintiff's Motion for Spoliation Finding (Dkt. 24) is **GRANTED IN PART** insofar as it seeks a permissive adverse-inference jury instruction about the contents of this evidence and **DENIED IN PART** insofar as it seeks a more detailed jury instruction with a list of mandatory inferences.

2.     The Government's Motion for Summary Judgment (Dkt. 13) is **GRANTED IN PART** and **DENIED IN PART**, in accordance with the findings set forth above.

DATED: March 24, 2017

B. Lynn Winmill
Chief Judge
United States District Court